**In Re SIMON II LITIGATION.**

**Simon II Litigation, Plaintiffs–Appellees,**

**v.**

**Philip Morris USA Inc. (formerly known as Philip Morris Incorporated), R.J. Reynolds Tobacco Co., Brown and Williamson Tobacco Corp. (individual-**

---

ly and as successor by merger to The American Tobacco Co.), Lorillard Tobacco Company, and Liggett Group, Inc., Defendants–Appellants.

Docket Nos. 03–7140, 03–7141.

United States Court of Appeals, Second Circuit.

Argued Nov. 20, 2003.

Decided May 6, 2005.

(Murray R. Garnick, David S. Eggert, Heather A. Pigman, Eric Suter, and Arnold & Porter, Washington, D.C.), for Defendant–Appellant Philip Morris USA Inc.

Theodore M. Grossman, Cleveland, OH (Robert H. Klonoff, Michael S. Fried, Washington, DC; Harold K. Gordon, George Kostolampros, New York, NY; and Jones Day, of counsel), for Defendant–Appellant R.J. Reynolds Tobacco Company.

(Peter A. Bellacosa and Kirkland & Ellis, LLP, New York, NY), for Defendant–Appellant Brown & Williamson Tobacco Corporation, individually and as successor by merger to The American Tobacco Company.

(Alan E. Mansfield, Stephen L. Saxl, and Greenberg Traurig, LLP, New York, NY), for Defendant–Appellant Lorillard Tobacco Company.

(Aaron H. Marks, New York, NY, Leonard A. Feiwus and Kasowitz, Benson, Torres & Friedman, LLP), for Defendant–Appellant, Liggett Group, Inc.

Elizabeth J. Cabraser, New York, N.Y. (Richard M. Heimann, Steven E. Fineman, Lieff Cabraser Heimann & Bernstein, LLP; Samuel Issacharoff, New York, NY; Perry Weitz, John M. Broaddus, Weitz &

Luxenberg, P.C., New York, NY; M. Frederick Pritzker, Gregory T. Arnold, Brown Rudnick Freed & Gesmer, P.C., Boston, MA; Dianne M. Nast, Roda & Nast, P.C., Lancaster, PA; Norwood Wilner, Spohrer Wilner Maxwell & Matthews, P.A., Jacksonville, FL; and Stanley M. Chesley and Waite, Schneider, Bayless & Chesley Co., Cincinnati, OH, of counsel), for Plaintiffs–Appellees.

(Kenneth S. Geller, Miriam R. Nemetz, Carl J. Summers, Mayer, Brown, Rowe & Maw, LLP, Washington, DC; and Robin S. Conrad, National Chamber Litigation Center, Inc., of counsel, Washington, DC), for Amicus Curiae Chamber of Commerce of the United States, in support of Defendants–Appellants.

(Daniel J. Popeo, Richard A. Samp, and Washington Legal Foundation, Washington, DC), for Amici Curiae Washington Legal Foundation and The National Association of Manufacturers, in support of Defendants–Appellants.

(Jeffrey R. White, Center for Constitutional Litigation, Washington, DC; Mary E. Alexander, President, The Association of Trial Lawyers of America, Washington, DC, of counsel), for Amicus Curiae The Association of Trial Lawyers of America, in support of Defendants–Appellants.

(John H. Beisner, Jonathan D. Hacker, Shannon M. Pazur, O'Melveny & Myers, LLP, Washington, DC; and Hugh F. Young, Jr., Product Liability Advisory Council, Inc., Reston, VA, of counsel), for Amicus Curiae Product Liability Advisory Council, Inc., in support of Defendants–Appellants.

(David C. Vladeck, Georgetown University Law Center, Washington, DC; and Richard A. Daynard, Northeast University Law School, Boston, MA, of counsel), for Amici Curiae American Cancer Society, American Heart Association, American Lung Association, National Center for Tobacco–Free Kids, Tobacco Control Resource Center, Center for a Tobacco Free New York, Tobacco Control Legal Consortium, and Dr. C. Everett Koop, in support of neither party.

Before OAKES, POOLER and WESLEY, Circuit Judges.

OAKES, Senior Circuit Judge.

Defendant-appellant tobacco companies appeal from the September 19, 2002, order and October 22, 2002, supplemental memorandum and order of the United States District Court for the Eastern District of New York, Jack B. Weinstein, *Judge*, which certified a nationwide non-opt-out class of smokers seeking only punitive damages under state law for defendants' alleged fraudulent denial and concealment of the health risks posed by cigarettes. Having granted permission to appeal pursuant to Federal Rule of Civil Procedure 23(f), we must decide whether the district court properly certified this class under Rule 23(b)(1)(B).

Defendant-appellants challenge the propriety of certifying this action as a limited fund class action pursuant to a "limited punishment" theory. The theory postulates that a constitutional limit on the total punitive damages that may be imposed for a course of fraudulent conduct effectively limits the total fund available for punitive awards.

We hold that the order certifying this punitive damages class must be vacated because there is no evidence by which the district court could ascertain the limits of either the fund or the aggregate value of punitive claims against it, such that the postulated fund could be deemed inadequate to pay all legitimate claims, and thus plaintiffs have failed to satisfy one of the presumptively necessary conditions for

limited fund treatment under *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999).

While we expressly limit our holding to the conclusion that class certification is incompatible with *Ortiz*, the circumstances warrant some discussion of whether the order is incompatible with the Supreme Court's intervening decision in *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). As we discuss in Part II, Section F, of this opinion, it appears that the order fails to ensure that a potential punitive award in this action would bear a sufficient nexus, and be both reasonable and proportionate, to the harm or potential harm to the plaintiff class and to the general damages to be recovered, as required by *State Farm*.

Based on our holding, we vacate the district court's certification order and remand for further proceedings.

## I.

### FACTS AND PROCEDURAL HISTORY

The district court certified the class proposed by the Third Amended Consolidated Class Action Complaint and an accompanying motion for class certification, both filed on July 26, 2002. The district court's September 19, 2002, order and the supplemental memorandum and order of October 22, 2002, are published together at *In re Simon II Litigation*, 211 F.R.D. 86, 96, 101 (E.D.N.Y.2002), and will be referred to collectively as the "Certification Order."

Plaintiffs sought certification to determine defendants' fraudulent course of conduct and total punitive damages liability to a class consisting of those who suffered from, or had died from, diseases caused by smoking. Plaintiffs did not seek a classwide determination or allocation of compensatory damages or seek certification of

subclasses. The certification followed extensive briefing and argument, not to mention numerous iterations of both the complaint and the proposed class.

An abbreviated history of the course of the litigation is outlined below. Additional procedural history of the cases related to this litigation appears in the district court's Certification Order. *See* 211 F.R.D. at 131–38.

### A.

The industry conspiracy prompting this litigation is described briefly in the allegations of the Third Amended Complaint and in considerable detail in the Certification Order. *See* 211 F.R.D. at 114–26. We will simply excerpt a relevant portion of the district court's description of the allegations:

> Plaintiffs allege, and can provide supporting evidence, that, beginning with a clandestine meeting in December 1953 at the Plaza Hotel in New York City among the presidents of Philip Morris, R.J. Reynolds, American Tobacco, Brown & Williamson, Lorillard and U.S. Tobacco, tobacco companies embarked on a systematic, half-century long scheme to . . .:(a) stop competing with each other in making or developing less harmful cigarettes; (b) continue knowingly and willfully to engage in misrepresentations and deceptive acts by, among other things, denying knowledge that cigarettes caused disease and death and agreeing not to disseminate harmful information showing the destructive effects of nicotine and tobacco consumption; (c) shut down research efforts and suppress medical information that appeared to be adverse to the Tobacco Companies' position that tobacco was not harmful; (d) not compete with respect to making any claims relating to

the relative health-superiority of specific tobacco products; and (e) to confuse the public about, and otherwise distort, whatever accurate information about the harmful effects of their products became known despite their "[efforts to conceal such information.]"

211 F.R.D. at 114 (quoting ¶ 104 of the complaint in *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 178 F.Supp.2d 198 (E.D.N.Y.2001) (alteration in original), and citing *Falise v. Am. Tobacco Co.*, 94 F.Supp.2d 316, 329–33 (E.D.N.Y.2000), to which the *Simon II* Third Amended Complaint refers for description of the fraudulent conduct).

In 1999, a group of cigarette smokers filed a class action captioned *Simon v. Philip Morris Inc.*, No. 99 CV 1988(JBW) ("*Simon I*"), on behalf of 20–pack–year smokers. They sought a determination of both compensatory and punitive damages for personal injury or wrongful death caused by lung cancer. Plaintiffs limited the class to 20–pack–year smokers because their medical and scientific experts had determined that, for that class, general and specific causation merged, and both could be proved class-wide without individual trials.

The *Simon I* class moved for certification in April 2000. Without ruling on the certification motion, the district court issued an order on April 18, 2000, consolidating *Simon I* and seven other tobacco-related suits pending before it "for purposes of settlement and for no other purpose." *In re Tobacco Litig.*, 192 F.R.D. 90, 95 (E.D.N.Y.2000).[1] Following a discussion in chambers among counsel concerning possible settlement, the district court issued an order on May 9, 2000, that raised questions for continued discussion, including whether there was a limited fund for punitive damages, given the actual and potential individual and class action punitive damages sought, and whether a final punitive award, rather than multiple repeated punitive awards, would be equitable. *See In re Tobacco Litig.*, 193 F.R.D. 92, 93 (E.D.N.Y.2000).

On September 6, 2000, individual and representative plaintiffs in ten existing actions filed a consolidated class action complaint, *In re Simon (II) Litigation*, No. 00–CV–5332 (JBW) (E.D.N.Y.) (hereinafter "*Simon II*"), on behalf of a proposed comprehensive nationwide class[2] seeking, pursuant to Fed.R.Civ.P. 42(a) and (b) and Fed.R.Civ.P. 21, a joint trial of the com-

---

**1.** The April 18, 2000, Order consolidated *Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.*, No. 98–CV–1492; *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, No. 98–CV–3287; *Raymark Indus., Inc. v. Am. Tobacco Co.*, No. 98–CV–0675; *H.K. Porter Co. v. Am. Tobacco Co.*, No. 97–CV–7658; *Falise v. Am. Tobacco Co.*, No. 99–CV–7392; *Bergeron v. Philip Morris, Inc.*, No. 99–CV–6142; *Liggett Group Inc. v. Latham & Watkins*, No. 99–CV–7529; with *Simon v. Philip Morris, Inc.*, No. 99–CV–1988. *See* 192 F.R.D. 90.

**2.** The actions listed and consolidated in the September 6, 2000, complaint under the caption *In re Simon II Litigation* included four smokers' class actions [*Simon I; Decie v. Am. Tobacco Co.*, No. 00–CV–2340 (JBW)

(E.D.N.Y.); *Ebert v. Philip Morris Inc.*, No. 00–CV–4632 (JBW) (E.D.N.Y.); and *Mason v. Am. Tobacco Co.*, No. 00–CV–4442 (JBW) (E.D.N.Y.)], two union health fund class actions [*Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.*, No. 98–CV–1492 (JBW) (E.D.N.Y.) and *Bergeron v. Philip Morris, Inc.*, No. 99–CV–6142 (JBW) (E.D.N.Y.)], a third-party payor action [*Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, No. 98–CV–3287 (JBW) (E.D.N.Y.)], and three actions by asbestos entities or asbestos entities' trusts [*H.K. Porter Co. v. Am. Tobacco Co.*, No. 97–CV–7658 (JBW) (E.D.N.Y.); *Raymark Indus., Inc. v. Am. Tobacco Co.*, No. 98–CV–0675 (JBW) (E.D.N.Y.); and *Falise v. Am. Tobacco Co.*, No. 99–CV–7392 (JBW) (E.D.N.Y.)].

mon questions of law and fact determining defendants' total liability for punitive damages on all claims and theories of relief. Plaintiffs also sought declaratory judgment under Fed.R.Civ.P. 57 to determine and provide for the equitable allocation of a punitive damages award. The complaint listed six "Class Claims Supporting and/or Serving As Compensatory Predicates for Punitive Damages," namely, a claim for fraud or fraudulent concealment, a claim of civil conspiracy, a claim for unjust enrichment, restitution and disgorgement, a claim for violations of New York or other states' consumer protection laws, and two federal civil RICO claims.

On December 22, 2000, plaintiffs filed the First Amended Consolidated Class Action Complaint in *Simon II*[3] and moved for class certification. The district court had denied the pending class certification motion in *Simon I* by order filed November 6, 2000, stating that "[e]ven though Simon I is a viable class action," denial of certification "would better preserve court resources to certify the broader Simon II class for trial." On March 15, 2001, the district court heard oral argument on the *Simon II* motion for certification and issued an order reserving decision and inviting the parties to make any additional submissions.

Following an April 30, 2002, status conference, plaintiffs decided to narrow *Simon II* to include only the three cigarette smoker class actions, *Simon I*, *Decie*, and *Ebert, see supra* n.2, and accordingly filed the Second Amended Consolidated Class Action Complaint on May 28, 2002, and an amended motion for class certification. In the Second Amended Complaint, plaintiffs asserted a total of seven "Class Claims":

four for product liability (design defect, failure to warn, negligent design, and negligent failure to warn), one for fraudulent concealment or conduct, one for conspiracy, and another for unjust enrichment. Balancing the approaches taken in *Simon I* and initially in *Simon II*, the amended and renewed motion for class certification of May 28, 2002, sought certification on behalf of two classes: a class of 20–pack–year smokers with lung cancer to be certified for all purposes, including compensatory and punitive damages, and a broader disease-based class solely for purposes of determining class-wide punitive damages. The first was to be an opt-out class under Rule 23(b)(3) and the latter a non-opt-out punitive damages class under Rule 23(b)(1)(B). Following briefing and oral argument, the district court reserved decision and suggested class counsel revise their class proposal.

During a July 2, 2002, hearing on the certification motion, the district court expressed reservations about plaintiffs' proposal to limit a smokers' class to persons with lung cancer only or to persons with a 20–pack–year history of cigarette smoking only. The district court indicated that it was not inclined to certify a portion of the class for compensatory damages purposes, but that the majority of the class could be certified for punitive damages only.

On July 26, 2002, Plaintiffs filed the Third Amended Complaint and an accompanying amended and renewed motion for class certification, which precipitated the Certification Order at issue here. Plaintiffs sought certification of a single class of smokers suffering from various diseases which the medical community attributes to smoking, including 20–pack–year smokers

---

**3.** The *Simon II* First Amended Complaint filed December 22, 2000, dropped two federal RICO claims listed in the original complaint, but retained the remaining four "Class Claims Supporting an Award of Punitive Damages." The complaint distinguished between a "Fraudulent Conduct Class" and a "Punitive Damages Class."

with lung cancer, for the sole purpose of determining defendants' total liability for punitive damages.

## B.

Upon considering the class proposed by plaintiffs' Third Amended Complaint and the motion for certification, the district court certified a punitive damages non-opt-out class pursuant to Rule 23(b)(1)(B). *See* 211 F.R.D. at 99. The class definition included current and former smokers of defendants' cigarettes who are U.S. residents, or who resided in the U.S. at time of death, and were first diagnosed between April 9, 1993, and the date of dissemination of class notice, with one or more of the following diseases: lung cancer, laryngeal cancer, lip cancer, tongue cancer, mouth cancer, esophageal cancer, kidney cancer, pancreatic cancer, bladder cancer, ischemic heart disease, cerebrovascular heart disease, aortic aneurysm, peripheral vascular disease, emphysema, chronic bronchitis, or chronic obstructive pulmonary disease. The class excluded persons who had obtained judgment or settlement against any defendant, persons against whom defendants had obtained judgment, members of the certified class in *Engle v. R.J. Reynolds Tobacco Co.,* No. 94–08273 CA–22, 2000 WL 33534572 (Fla.Cir.Ct. Nov.6, 2000),[4] persons who reasonably should have realized they had the disease prior to April 9, 1993, and persons whose diagnosis or reasonable basis for knowledge predated tobacco use. *See* 211 F.R.D. at 99–100.

The district court determined that the class action would proceed in three stages. In the first stage, a jury would make "a class-wide determination of liability and estimated total value of national undifferentiated compensatory harm to all members of the class." *Id.* at 100. The sum of compensatory harm would "not be awarded but will serve as a predicate in determining non-opt-out class punitive damages." *Id.* The same jury would determine compensatory awards, if any, for individual class representatives, although the class itself did not seek compensatory damages. In the second stage, the same jury would determine whether defendants engaged in conduct that warrants punitive damages. *Id.* In the third stage, the same jury would determine the amount of punitive damages for the class and decide how to allocate damages on a disease-by-disease basis. The court would then distribute sums to the class on a pro-rata basis by disease to class members who submit appropriate proof. Any portion not distributed to class members would be "allocated by the court on a *cy pres* basis to treatment and research organizations working in the field of each disease on advice of experts in the fields." *Id.* The order specified that the

---

4. In *Engle,* a class action by Florida smokers against cigarette manufacturers, a jury determined punitive damages in the aggregate for the entire class. The evidence indicated the class could comprise up to several hundred thousand people; the court found that a punitive damages award of approximately $145 billion bore a reasonable relationship to damages proved and injuries suffered, and that the award was in keeping with the degree of the wrongful conduct without "sending the defendant into bankruptcy." 2000 WL 33534572, at *31. The trial court therefore denied the defendants' motion for a new trial or, in the alternative, a remittitur, on the grounds of excessiveness of the punitive damages award. On May 31, 2003, however, the Florida District Court of Appeal reversed, with instructions to decertify the class, which could thereupon pursue individual claims, and held that the punitive award was precluded by Florida's 1997 Settlement Agreement with the tobacco companies. *Liggett Group Inc. v. Engle,* 853 So.2d 434 (Fla.Dist.Ct.App. 2003). The Supreme Court of Florida recently granted review, *Engle v. Liggett Group, Inc.,* 873 So.2d 1222 (Fla.2004) (unpublished table decision), oral argument was heard on November 3, 2004, and to this date the appeal is still pending.

jury would apply New York law according to conflicts of laws principles, *id.*, and reiterated that the court was not presented with and did not rule upon a compensatory class. *Id.* at 101. The district court noted that although plaintiffs chose the more limited course in pursuing a punitive class only, certification "for determination of compensatory damages to be distributed using an appropriate matrix would be possible and might be desirable in coordination with the class now certified." *Id.*

## II.

## DISCUSSION

### A. Standard of Review

■ We review the district court's order granting class certification for abuse of discretion, a deferential standard. *See Parker v. Time Warner Entm't Co.*, 331 F.3d 13, 18 (2d Cir.2003). "A district court 'abuses' or 'exceeds' the discretion accorded to it when (1) its decision rests on an error of law (such as the application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir.2001) (footnotes omitted).

We note that this case raises issues of first impression insofar as this Circuit has never squarely passed on the validity of certifying a mandatory, stand-alone punitive damages class on the proposed "limited punishment" theory.[5]

### B. Prerequisites for a Class Action under Rule 23(a)

The district court found that the proposed class satisfied the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy of representation. *See* 211 F.R.D. at 189–90. Appellants do not contest these particular findings. Rather, they direct their arguments to the district court's conclusion that this class action could be maintained under Rule 23(b)(1)(B).

### C. Standards for Maintaining a Class Action under Rule 23(b)(1)

In addition to showing that the class action prerequisites set out in Rule 23(a) have been met, a plaintiff must show that a class action is maintainable under either Rule 23(b)(1), (2) or (3). Fed.R.Civ.P. 23.

---

5. In a brief decision in *In re Diamond Shamrock Chemicals Co.*, 725 F.2d 858 (2d Cir. 1984), a panel of this Court denied a petition for mandamus to decertify both a Rule 23(b)(3) compensatory damages class and a Rule 23(b)(1)(B) punitive damages class certified in *In re "Agent Orange" Product Liability Litigation*, 100 F.R.D. 718 (E.D.N.Y.1983). Noting Judge Weinstein's justification for a punitive damages class in that case, namely that "adjudication with respect to individual members of the class ... would as a practical matter be dispositive of the interests of the other members not parties to the adjudication," we found simply that "[g]iven the large number of potential claimants, estimated by the Special Master to be over 40,000 and given the fact that punitive damages ought in theory to be distributed among the individual plaintiffs on a basis other than date of trial, the argument against his ruling does not justify issuance of a writ of mandamus." *Id.* at 862. The panel in *In re Joint Eastern and Southern District Asbestos Litigation* commented that while the denial of mandamus in *In re Diamond Shamrock* "does not imply approval," *In re Diamond Shamrock* "presented a situation much closer to the traditional concept of a limited fund than occurs whenever an entity becomes insolvent." 982 F.2d 721, 736 (2d Cir.1992) (permitting use of non-opt-out settlement class certified on theory that the inadequacy of a trust's assets, the trust being a creature of a plan of reorganization, constituted the limited fund, so long as district court designated appropriate subclasses), *opinion modified on rehearing*, 993 F.2d 7 (1993).

Rule 23(b)(1)(A) and (B) state the circumstances that would justify binding absent class members to avoid prejudice to a party adversary to the class, or to members of the proposed class, respectively:

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests[.]

Fed.R.Civ.P. 23(b)(1).

Plaintiffs in this case sought certification under Rule 23(b)(1)(B),[6] for which the relevant inquiry is whether separate actions by individual members of the class create a risk that individual adjudications would as a practical matter dispose of other class members' interests in punitive damages or substantially impair or impede their ability to protect their interests.

Suits under Rule 23(b)(1) are often referred to as "mandatory" class actions because they are not subject to the Rule 23(c) provision for notice to absent class members or the opportunity for potential class members to opt out of membership as a matter of right. *See Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 833 n. 13, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999). The Advisory Committee's Note for the 1966 Amendment of Rule 23 explains that "[t]he vice of an individual action would lie in the fact that the other members of the class, thus practically concluded, would have had no representation in the lawsuit." 39 F.R.D. 69, 101 (1966). The Committee Note cites by way of illustration several suits pre-dating the amendment that had warranted class treatment, including a suit by policyholders against a fraternal benefit association to attack the financial reorganization of the society, a suit by shareholders to compel declaration of a dividend or to compel proper recognition and handling of redemption and preemption rights, and an action charging a breach of trust by an indenture trustee or fiduciary, affecting a class of security holders or beneficiaries and requiring an accounting or other measure to restore the subject of the trust. *Id.*

Regarding the subset of these cases involving a limited fund, the Committee's Note remarks:

In various situations an adjudication as to one or more members of the class will necessarily or probably have an adverse practical effect on the interests of other members who should therefore be represented in the lawsuit. This is plainly the case when claims are made by numerous persons against a fund insufficient to satisfy all claims. A class action by or

---

**6.** Plaintiffs did not move for certification under Rule 23(b)(1)(A), although the Third Amended Complaint invokes Clause (A) and asserts that separate punitive awards "would establish incompatible standards of conduct for Defendants." Compl. at 20. We express no opinion regarding whether the circumstances here could satisfy Clause (A)'s requirements. "Courts are still struggling to develop guidelines governing the scope of Rule 23(b)(1)(A)." Herbert B. Newberg & Alba Conte, 2 *Newberg on Class Actions* § 4:4 (4th ed.2005).

against representative members to settle the validity of the claims as a whole, or in groups, followed by separate proof of the amount of each valid claim and proportionate distribution of the fund, meets the problem.

*Id.*

### D. Limited Fund Class Action Based on the "Limited Punishment" Theory

The district court, in certifying the punitive damages class under Rule 23(b)(1)(B), cited recent scholarship and court decisions that "have concluded that the theory of limited punishment supports a punitive damages class action." 211 F.R.D. at 184. "Under this theory," the district court stated, "the limited fund involved would be the constitutional cap on punitive damages, set forth in *BMW v. Gore* [517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)] and related cases." *Id.*[7]

The premise for this theory is that there is a constitutional due process limitation on the total amount of punitive damages that may be assessed against a defendant for the same offending conduct. Whether the limitation operates to prejudice the respective parties, it seems, turns on two contrary assumptions. For the potential

---

**7.** The district court referred to its discussion, earlier in the Certification Order, of *BMW v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), *TXO v. Alliance Resources*, 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), *Pacific Mutual Life Ins. Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), and *Cooper Industries v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001), *see* 211 F.R.D. at 163–64, as well as to articles by Elizabeth J. Cabraser & Thomas M. Sobol, *Equity for the Victims, Equity for the Transgressor: The Classwide Treatment of Punitive Damages Claims*, 74 Tulane L.Rev.2005, 2023 (2000) (authored in part by Plaintiffs' counsel, setting forth the theory); Joan Steinman, *Managing Punitive Damages: A Role for Mandatory "Limited Generosity" Classes and Anti–Suit Injunctions?*, 36 Wake Forest L.Rev. 1043 (2001); John C. Coffee, Jr., *The Tobacco Wars: Peace in Our Time?*, N.Y.L.J., July 20, 2000, at 1 (examining limited punishment in the context of tobacco litigation); Richard A. Nagareda, *Punitive Damage Class Actions and the Baseline of Tort*, 36 Wake Forest L.Rev. 943, 945–46 (2001) (assuming for purposes of the article existence of implied due process limit on cumulative punitive damage awards, but suggesting mandatory class actions were not appropriate); Samuel Issacharoff, *"Shocked": Mass Torts and Aggregate Asbestos Litigation After Amchem and Ortiz*, 80 Tex. L.Rev.1925 (2002); *and* Mark A. Behrens, *Some Proposals for Courts Interested in Helping Sick Claimants and Solving Serious Problems in Asbestos Litigation*, 54 Baylor L.Rev. 331, 352–57 (2002). 211 F.R.D. at 184–85.

The district court also discussed *In re Exxon Valdez*, a case in which an Alaska district court successfully certified a limited fund punitive damages class in order to prevent two separate punitive awards in the already-scheduled state and federal class action trials, but where the defendants, who faced a real risk of large punitive damages awards in the already certified compensatory claims, were the proponent of the class, invoking plaintiffs' interests under 23(b)(1)(B) as justification for certification under the limited fund theory. *In re Exxon Valdez*, No. A89–0095–CV (HRH), Order No. 180 Supplement at 8–9. The unpublished order is part of the record in this appeal, *see* Joint Appendix at 3207–19. The Alaska district court noted that the *Exxon* case involved "an unusual convergence of identity of occurrence, law, and fact," unlike most mass tort class actions, Joint Appendix at 3216, and that it mattered little whether the punitive damages claim was adjudicated in state or federal court; because the case sounded in admiralty, federal maritime law and any applicable Alaska state law applied in both the state and federal court actions. *Id.* at 3210. The 9th Circuit was later able to review the jury's punitive award of $5 billion and order that it be reduced. *See In re Exxon Valdez*, 270 F.3d 1215, 1246–47 (9th Cir. 2001); *see also In re Exxon Valdez*, 296 F.Supp.2d 1071 (D.Alaska 2004) (finding $5 billion did not violate *State Farm*, but reducing award to $4.5 billion to comply with remand order).

plaintiff, piecemeal individual actions or successive class actions for punitive damages would operate to his disadvantage if punitive awards in earlier-filed suits subtract from the constitutional total and thereby reduce or preclude punitive damages for future claimants. This proposition assumes that courts identify and successfully enforce the postulated total limit, and that plaintiffs have an interest in a ratable portion of the permissible damages. For defendants, piecemeal individual or successive class actions would pose a threat of excessive punishment in violation of their due process rights if successive juries assess awards that exceed the limit of what is necessary for deterrence and retribution. This proposition, to the contrary, assumes that early suits exhaust or exceed the constitutional limit and successive trial or appellate courts fail to enforce it by either reducing or barring awards. It is not clear whether the theory supposes that successive individual awards, which considered alone may be constitutionally permissible if they are reasonable and proportionate to the given plaintiff's harm and bear a sufficient nexus to that harm, may reach a point where the goals of punitive damages have been served, and successive victims of the same tortious course of conduct by the tortfeasor should be unable to recover punitive damages.

■ The notion of a constitutional cap on total allowable aggregate punitive damages awards, or on the number of times punitive awards can be made, has never been squarely articulated by the Supreme Court, but is said to derive from its precedents regarding punitive damages. In the Supreme Court's most recent punitive damages decision, *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), Justice Kennedy, writing for the majority, reiterated what the Court's prec-

edents had made clear: "While States possess discretion over the imposition of punitive damages, it is well established that there are procedural and substantive constitutional limitations on these awards. The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *Id.* at 416, 123 S.Ct. 1513 (internal citations to *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001), *BMW v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), *Honda Motor Co. v. Oberg*, 512 U.S. 415, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994), *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) omitted.) The Court pointed to concerns voiced in earlier cases: "To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *State Farm*, 538 U.S. at 417, 123 S.Ct. 1513 (quoting Justice O'Connor's dissent in *Haslip*, 499 U.S. at 42, 111 S.Ct. 1032 (1991) ("Punitive damages are a powerful weapon. Imposed wisely and with restraint, they have the potential to advance legitimate state interests. Imposed indiscriminately, however, they have a devastating potential for harm. Regrettably, common-law procedures for awarding punitive damages fall into the latter category.")).

"Punitive damages have long been a part of traditional state tort law," and Congress has provided for punitive damages in a number of statutes. *Haslip*, 499 U.S. at 15, 17 n. 6, 111 S.Ct. 1032 (internal quotation omitted). While compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct," punitive damages, "which have been de-

scribed as 'quasi-criminal,' operate as 'private fines' intended to punish the defendant and to deter future wrongdoing." *Cooper Indus.*, 532 U.S. at 432, 121 S.Ct. 1678 (internal citation omitted); *see also BMW v. Gore,* 517 U.S. at 568, 116 S.Ct. 1589 (punitive damages may further a "State's legitimate interests in punishing unlawful conduct and deterring its repetition"). In addition to serving the goals of punishment and deterrence, punitive damages have been "justified as a 'bounty' that encourages private lawsuits seeking to assert legal rights." *Smith v. Wade,* 461 U.S. 30, 58, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1982) (Rehnquist, *J.,* dissenting); *see also TVT Records v. Island Def Jam Music Group,* 279 F.Supp.2d 413, 425 (S.D.N.Y. 2003) (the punitive remedy "recognizes and rewards the unique risks the victims bear and the form of public service they render in enforcing the law against major offenders who otherwise might go unpunished and undeterred").

Despite the long-recognized possibility that defendants may be subjected to large aggregate sums of punitive damages if large numbers of victims succeed in their individual punitive damages claims, *see, e.g., Roginsky v. Richardson–Merrell, Inc.,* 378 F.2d 832, 839 (2d Cir.1967) (Friendly, *J.*) ("We have the gravest difficulty in perceiving how claims for punitive damages in such a multiplicity of actions throughout the nation can be so administered as to avoid overkill."), the United States Supreme Court has not addressed whether successive individual or class action punitive awards, each passing constitutional muster under the relevant precedents, could reach a level beyond which punitive damages may no longer be awarded.

E. The Traditional "Limited Fund" Class Action Under *Ortiz v. Fibreboard Corp.*

■ This brings us to appellants' chief argument—that class certification under Rule 23(b)(1)(B) is precluded by the Supreme Court's decision in *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999), because the proposed class plaintiffs have failed to demonstrate what the Supreme Court identified as the "presumptively necessary" conditions for certification in limited fund cases. *See id.* at 842, 119 S.Ct. 2295. Although *Ortiz* considered a set of circumstances quite unlike those in the instant case when it reviewed the certification of a Rule 23(b)(1)(B) mandatory settlement class on a limited fund theory,[8] it identified, in the

---

**8.** *Ortiz* held that "applicants for contested certification on this rationale must show that the fund is limited by more than the [settlement] agreement of the parties, and has been allocated to claimants belonging within the class by a process addressing any conflicting interests of class members." *Ortiz,* 527 U.S. at 821, 119 S.Ct. 2295. In *Ortiz,* the defendant Fibreboard Corporation, a former manufacturer of products containing asbestos, negotiated a global settlement of its personal injury liability with its insurance providers and plaintiffs' counsel. When one insurer conditioned its participation in any settlement on a guarantee of "total peace" that ensured against unknown future liabilities, "talks focused on the feasibility of a mandatory class action, one binding all potential plaintiffs and giving none of them any choice to opt out ...." *Id.* at 824, 119 S.Ct. 2295. Presented with the difficulty of settling both pending and potential future claims, the parties agreed to segregate and settle an inventory of pending claims. *Id.* The parties struck a global settlement agreement to set aside $1.535 billion. Pursuant to the settlement agreement, a group of plaintiffs filed an action seeking certification for settlement purposes of a mandatory class comprising three groups of plaintiffs: personal injury claimants who had not yet brought suit or settled, potential future claimants who had dismissed their claims but retained their right to sue, and past, present and future relatives of exposed class members. The class excluded claimants with pending suits and claimants who had settled

historical antecedents to Rule 23, the characteristic conditions that justified binding absent class members. It summarized those characteristics as "a 'fund' with a definitely ascertained limit, all of which would be distributed to satisfy all those with liquidated claims based on a common theory of liability, by an equitable, pro rata distribution." *Id.* at 841, 119 S.Ct. 2295. Given the presumptive necessity of these characteristics, "the burden of justification rests on the proponent of any departure from the traditional norm." *Id.* at 842, 119 S.Ct. 2295.

The first characteristic, a fund "with a definitely ascertained limit," usually entailed a situation where "the totals of the aggregated liquidated claims and the fund available for satisfying them, set definitely at their maximums, demonstrate the inadequacy of the fund to pay all the claims." *Id.* at 838, 119 S.Ct. 2295. "The concept driving this type of suit was insufficiency, which alone justified the limit on an early feast to avoid a later famine." *Id.* The second characteristic required that "the whole of the inadequate fund was to be devoted to the overwhelming claims." *Id.* at 839, 119 S.Ct. 2295. In other words, the defendant with the inadequate fund "had no opportunity to benefit himself or claimants of lower priority by holding back on the amount distributed to the class," thus ensuring that the limited fund case "did not give a defendant a better deal than *seriatim* litigation would have produced." *Id.* The third characteristic required that "the claimants identified by a common theory of recovery were treated equitably among themselves. The cases assume that the class will comprise everyone who might state a claim on a single or repeated set of facts, invoking a common theory of recovery, to be satisfied from the limited fund as the source of payment." *Id.*

and retained only limited rights to future

While neither the Rule itself, nor the Advisory Notes accompanying it, purports to delineate the outer limits of the Rule's application in the particular subset of "limited fund" cases, the Supreme Court in *Ortiz* has read the "limited fund" case as being moored to the Rule's historical antecedents, describing the classic actions as involving, for instance, "claimants to trust assets, a bank account, insurance proceeds, company assets in a liquidation sale, proceeds of a ship sale in a maritime accident suit, and others." *Id.* at 834, 119 S.Ct. 2295 (quoting Herbert B. Newberg & Alba Conte, 1 *Newberg on Class Actions* § 4.09, at 4–33 (3d ed.1992)). In these cases, "equity required absent parties to be represented, joinder being impractical, where individual claims to be satisfied from the one asset would, as a practical matter, prejudice the rights of absent claimants against a fund inadequate to pay them all." *Id.* at 836, 119 S.Ct. 2295.

The *Ortiz* Court sounded a number of cautionary notes, expressing its extreme hesitation to apply Rule 23 in ways that would have been beyond the contemplation of the drafters of the Advisory Committee Notes. *See id.* at 842, 119 S.Ct. 2295 ("the Advisory Committee looked cautiously at the potential for creativity under Rule 23(b)(1)(B), at least in comparison with Rule 23(b)(3)," and was "consciously retrospective with intent to codify pre-Rule categories under Rule 23(b)(1), not forward looking as it was in anticipating innovations under Rule 23(b)(3)").

Keeping in mind that the Court has thus counseled "against leniency in recognizing mandatory limited fund actions in circumstances markedly different from the traditional paradigm," *id.* at 864, 119 S.Ct. 2295, we hold that the first fundamental requisite for limited fund treatment is

claims. *Id.* at 825–27, 119 S.Ct. 2295.

lacking here, because there was no "evidence on which the district court may ascertain the limit and the insufficiency of the fund." *Id.* at 849, 119 S.Ct. 2295.

The proposed fund in this case, the constitutional "cap" on punitive damages for the given class's claims, is a theoretical one, unlike any of those in the cases cited in *Ortiz*, where the fund was either an existing res or the total of defendants' assets available to satisfy claims. The fund here is—in essence—postulated, and for that reason it is not easily susceptible to proof, definition, or even estimation, by any precise figure. It is therefore fundamentally unlike the classic limited funds of the historical antecedents of Rule 23.

Not only is the upper limit of the proposed fund difficult to ascertain, but the record in this case does not evince a likelihood that any given number of punitive awards to individual claimants would be constitutionally excessive, either individually or in the aggregate, and thus overwhelm the available fund.[9]

Without evidence indicating either the upper limit or the insufficiency of the posited fund, class plaintiffs cannot demonstrate that individual plaintiffs would be prejudiced if left to pursue separate actions without having their interests represented in this suit, as Rule 23(b)(1)(B) would require.

Defendant-appellants also argue that there are two ways in which the class certified fails to exhibit the third presumptively necessary characteristic of a limited fund case, namely, that "the claimants identified by a common theory of recovery were treated equitably among themselves."

*Ortiz*, 527 U.S. at 839, 119 S.Ct. 2295. First, they argue that the class is fatally under-inclusive, and, second, they argue that the Certification Order fails to provide for equitable treatment among class members. The *Ortiz* Court found that these same two issues undermined the requirement of equity among class members for the settlement class in that case. *See id.* at 854–55, 119 S.Ct. 2295. Because we decertify the class on other grounds, we need not resolve the equity question, which would be relevant only if the class were going forward as certified.

### F. Punitive Awards After *State Farm Mutual Automobile Life Ins. Co. v. Campbell*

While our holding in this case rests exclusively on the conclusion that certification is incompatible with *Ortiz*, we have an additional concern that warrants some discussion. It seems that a punitive award under the circumstances articulated in the Certification Order is likely to run afoul of the Supreme Court's admonitions in *State Farm*, a decision handed down several months after the Certification Order issued. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). In certifying a class that seeks an assessment of punitive damages prior to an actual determination and award of compensatory damages, the district court's Certification Order would fail to ensure that a jury will be able to assess an award that, in the first instance, will bear a sufficient nexus to the actual and potential harm to the plaintiff class, and that will be reasonable and proportionate to those harms.

9. We are not here presented with what might be a closer question—that is, if a standard class action had resulted in a verdict for compensatory damages for the class in one stage of a trial, and the mandatory class proponent wished to bind absent class members to any determination of a punitive award in a subsequent stage, because the given number of outstanding individual claims and the anticipated punitive award could demonstrably result in an unconstitutionally large punitive award.

In *State Farm*, the Supreme Court held that the state appellate court erred in reinstating a $145 million punitive damages award that the jury had assessed for an automobile liability insurer's bad faith refusal to settle an accident claim on behalf of the Campbells, its insureds. *See* 538 U.S. at 429, 123 S.Ct. 1513. The Court held that the excessive punitive award violated due process where compensatory damages were $1 million and evidence of out-of-state conduct unrelated to the insureds' specific harm permitted the jury to condemn State Farm for its nationwide policies. *See id.* at 420, 123 S.Ct. 1513. Although the Court was considering an award in an individual, not a class, action, it noted that punishment on any basis that does not have a nexus to the specific harm suffered by the plaintiff "creates the possibility of multiple punitive damages awards for the same conduct; for in the usual case nonparties are not bound by the judgment some other plaintiff obtains." *Id.* at 423, 123 S.Ct. 1513. In addressing the punitive award to the Campbells, the Court stated, "we have been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. We decline again to impose a bright-line ratio which a punitive damages award cannot exceed." *Id.* at 424–25, 123 S.Ct. 1513 (citation omitted). Recognizing that "there are no rigid benchmarks," the Court noted that greater ratios may be warranted "where a particularly egregious act has resulted in only a small amount of economic damages" or "where the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Id.* at 425, 123 S.Ct. 1513 (internal quotations omitted). "In sum," the Court concluded, "courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *Id.* at 426, 123 S.Ct. 1513.

Furthermore, with respect to the evidence to be considered at the punitive damages stage, *State Farm* indicates that a jury could not consider acts of as broad a scope as the district court in this case anticipated. The Certification Order in this case provides:

> This class action is intended to cover all punitive damages nationwide. This could include punitive damages due to outrageous conduct by defendants towards non-class members. The punitive function served by this certified class could be utilized in part for persons outside the class as, for example, passive breathers of the smoke exuded by others, those with diseases other than those represented by this certified class, and future diseased persons.... Allowing the jury to consider evidence of damage to others at this stage in setting the punitive award is appropriate in a nationwide class action where a portion of the harmful behavior may not be correlatable with class members.

211 F.R.D. at 186.

*State Farm* made clear that conduct relevant to the reprehensibility analysis must have a nexus to the specific harm suffered by the plaintiff, and that it could not be independent of or dissimilar to the conduct that harms the plaintiff. 538 U.S. at 422–23, 123 S.Ct. 1513. Harmful behavior that is not "correlatable" with class members and the harm or potential harm to them would be precluded under *State Farm*.

## G. Defendant–Appellants' Other Arguments

Defendant-appellants also contend the Certification Order runs afoul of the Rules Enabling Act, 28 U.S.C. § 2072(b) (2000), because, on a number of counts, it alters or

abridges the parties' substantive rights. Defendant-appellants challenge the imposition of class-wide liability for punitive damages in the absence of individualized proof of the elements of the causes of action on which punitive damages would be predicated. They also claim that the trial plan to resolve individual compensatory claims in separate follow-on actions to the class-wide punitive damages determination would subject the facts underlying the compensatory claims to re-examination by successive juries in violation of the Seventh Amendment.

Because we have held that certification is incompatible with *Ortiz,* we need not address whether the district court's proposed statistical aggregation of proof, or its invocation of a "fraud-on-the-market" theory, would have been appropriate for a class-wide approximation of compensatory liability in this case, or for proof of any given element going toward actual liability in a conventional class action for compensatory and punitive damages. Our holding also disposes of any need to address the controversy surrounding the challenged follow-on actions.

Defendant-appellants also challenge the Certification Order's determination that "the single law of New York's compensatory and punitive damages will apply." 211 F.R.D. at 167. The district court did not certify the class to determine compensatory damages but, rather, called for New York law to be applied "to determine compensatory damages primarily as a predicate for punitive damages ...." 211 F.R.D. at 174. Because it is unclear what course plaintiffs may ultimately seek on remand regarding class certification, we need not address the hypothetical question of whether the district court could apply only New York law to a yet-undefined potential compensatory and/or punitive damages class.

## III.

## CONCLUSION

The proposed class having failed to satisfy the threshold requirements for certification set forth in *Ortiz* and Rule 23(b)(1)(B), we must vacate the district court's certification order and remand for further proceedings.